IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

UNITED STATES OF AMERICA,

      Plaintiff,

    v.

                              Criminal Action No. 5:17-CR-35

STEPHANIE LEE KENYON,

      Defendant.

## REPORT AND RECOMMENDATION

## I.    INTRODUCTION

On August 9, 2017, the Grand Jury named Stephanie Lee Kenyon ("Defendant") in a two-count indictment.  Count One of the indictment charges her with identity fraud.  Count Two charges her with interstate transportation of stolen property.  There is also a forfeiture allegation.

The Defendant filed two motions to suppress; one motion to suppress statements, and one motion to suppress a vehicle search; as well as a supplemental motion to suppress the traffic stop leading to the search.  ECF Nos. 16, 17, and 25.  The Court held a hearing regarding these motions.  The hearing was split between February 7, and February 21, 2018.  At both portions of the hearing, the Defendant appeared in person and by her counsel Brendan S. Leary, Esq.  The Government appeared through its counsel David J. Perri, Esq.   Corporal Sean Brantley and Officer Erick Burke testified on behalf of the Government.

For the following reasons, the Count recommends that Defendant's Motion [ECF No. 16] to Suppress Statements and Motion [ECF No. 17] to Suppress Search of Vehicle for Unreasonable Extension of Traffic Stop be **GRANTED**; and that Defendant's Supplemental Motion [ECF No. 25] to Suppress Search of Vehicle for Illegal Traffic Stop and Unreasonable Extension of the Traffic Stop be **DENIED** in part and **DENIED AS MOOT** in part.

## II.    FINDINGS OF FACT

On May 13, 2017, Corporal Sean Brantley of the Wheeling Police department conducted a traffic stop of a white Ford Expedition which was traveling east on Interstate 70.   After pursuing the vehicle for roughly ten miles, the stop was effectuated around mile marker seven at 10:16 a.m. on that date.   The occupants of the vehicle were a male driver, Mr. Gilmore; a female passenger, Ms. O'Brien; and the Defendant, who was initially lying across the back seat with a blanket draped over her.

Corporal Brantley, after speaking briefly to the front seat passengers, asked for their registration and proof of insurance for the vehicle, as well as identification for all three occupants.   During this time, he also began asking other questions about where they had been, why they had been there, and where they were going.   The front seat passengers produced identifications, but informed Corporal Brantley that the backseat passenger did not have an ID. Ms. O'Brien said that she was from Florida, her name was Leah Whitmil, and provided a date of birth.   They were also able to produce registration and proof of insurance for the vehicle, which was a rental vehicle, but were not able to produce a rental agreement.

Corporal Brantley was able to verify that the identifications provided by both Mr. Gilmore and Ms. O'Brien were valid, but was unable to find any record under the name and date of birth he had been provided for the back seat passenger, the Defendant.

At approximately 10:28 a.m., Officer Burke arrived on the scene.   Corporal Brantley filled him in on his observations of what was taking place, and Officer Burke went and spoke to the passengers as well.   After Officer Burke spoke with the passengers, he went and spoke with Corporal Brantley again.   At this point, they decided to conduct a canine sniff of the vehicle.   It was also around this time when all passengers were asked to exit the vehicle.   Corporal Brantley

2

then walked his canine around the vehicle.  The canine alerted by sitting down near the rear passenger side of the vehicle.

After the canine alerted, Corporal Brantley proceeded to perform a search of the vehicle. Corporal Brantley found various types of large bags in the rear of the vehicle.  He asked the passengers to identify which bags belonged to whom.  The passengers all did so until it came to two Nike duffel bags, which appeared to be new and had tags still on them.  Corporal Brantley described these bags as being very heavy.  When asked who the duffel bags belonged to, none of the passengers initially claimed ownership, eventually claiming it belonged to all of them. Corporal Brantley asked them what was inside.  Mr. Gilmore responded that it was electronics. Corporal Brantley eventually opened the bags and discovered many Apple products such as laptops, phones, and watches; all in what appeared to be their original packaging.  At some point while Corporal Brantley was going through the electronics, Ms. O'Brien claimed ownership of the duffel bags containing the electronics, and claimed to have purchased them on eBay.

At approximately 11:34 a.m. Corporal Brantley attempted to question Ms. O'Brien about the contents of the bags, but aside from claiming ownership, Ms. O'Brien declined to answer Corporal Brantley's questions.   Shortly thereafter, at approximately 11:37 a.m., Corporal Brantley and the Defendant had a conversation at the front of the rental vehicle in which the Defendant gives Corporal Brantley her true name, and tells him that she is wanted by law enforcement.  After going to his cruiser to check with dispatch regarding the name and date of birth provided to him by the Defendant, Corporal Brantley returned to the front of the vehicle and continued speaking with the Defendant.  This ultimately led the Defendant to make several incriminating statements, including claiming that the Apple products actually belonged to her,

and that her bags also contained several fake IDs and credit cards, as well as a device used for producing the fake credit cards.

## III.   DISCUSSION

The Defendant filed two motions to suppress, as well as a supplemental motion to suppress.  All told, they raise four distinct issues: 1. The legality of the initial traffic stop, 2. The legality of the extension of the traffic stop, 3. The search of the vehicle, and 4. The failure of Corporal Brantley to mirandize the Defendant prior to speaking with her.  The Court will address these issues separately in the order listed above.

### A.   The Initial Traffic Stop

In her Supplemental Motion, the Defendant challenges the basis for the traffic stop, arguing that no traffic infraction was committed and that "[o]fficer Brantley saw a new model Ford Expedition with a New York license plate and nothing more."  ECF No. 25 at 4.  Corporal Brantley contends that multiple traffic infractions he saw the vehicle commit was the basis for the initial traffic stop.  Further, he says he did not notice the New York license plate until he caught up to, and pulled the vehicle over.

An officer's "decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred."  *Whren v. United States*, 517 U.S. 806, 809 (1996).  Corporal Brantley was in the median of the interstate turning around when the vehicle in which the Defendant was a passenger caught his attention.  He testified that the vehicle initially garnered his attention because it started to cross over the center line, then jerked back into the lane it was originally in.  Because of this, he began to pursue the vehicle.  While pursuing the vehicle, he also observed the vehicle following too closely; and, in his estimation, speeding.  All three are violations of West Virginia law.  W. Va. Code §§ 17C-7-10, 17C-7-6, 17C-6-1.

4

The Court finds this issue to be straightforward and the traffic stop, at its inception, to be routine.  The Defendant presents no evidence; rather, they make only assertions and suggestions to support their claim that Corporal Brantley did not have probable cause to believe a traffic violation had occurred.  For instance, Defendant makes much of the fact that Corporal Brantley did not confirm with a radar gun that the vehicle was speeding.  They also point to the fact that none of the infractions can be seen in the dash cam video from Corporal Brantley's patrol car. Indeed, this is true.  However, due to the location of the dash cam, the vehicle is not even visible on the dash cam footage until Corporal Brantley is directly behind the vehicle as it pulls over. Up until that point, there are either vehicles in between the dash cam and the vehicle the Defendant was in, or the vehicle is too far ahead to be seen.  You can, however, hear Corporal Brantley on the video commenting about some of the infractions he sees taking place. Additionally, the left of center infraction that led Corporal Brantley to initiate the pursuit of the Expedition to begin with happens when Corporal Brantley's cruiser is parked in the median.  The angle is such that it would be difficult to see even if the camera were pointed directly at the vehicle the Defendant was in.

As for Corporal Brantley not confirming the speeding violation with a radar gun, it is worth noting that Corporal Brantley needed only probable cause to believe a traffic violation had occurred under *Whren*, not irrefutable proof.  Due to the foregoing, the Court finds that Corporal Brantley had probable cause to believe multiple traffic violations had occurred, thus rendering the initial traffic stop valid.

**B.**     **Extension of the Traffic Stop**

The Defendant takes issue with several issues regarding the length of the stop.  ECF No. 17.  First, the stop lasted for nearly two hours.  Additionally, the canine, despite being at the

5

scene of the nearly two hour stop in Corporal Brantley's cruiser the entire time, was not led around the vehicle until over 35 minutes after the stop had been made, another issue of contention for the Defendant.  The Defendant also takes issue with Corporal Brantley, and later Officer Burke, taking time to ask numerous questions that clearly had motives beyond the reason for the initial traffic stop and the issuance of tickets or warnings.  The Defendant says that "[t]hroughout the entire exchange before the dog was used to sniff the exterior of the Expedition, both officers were questioning the occupants of the vehicle and gathering information that they could use to justify their conclusion that reasonable suspicion existed that criminal activity was afoot."  ECF No. 17 at 6.  All this, Defendant says, constitutes an unconstitutional extension of the traffic stop culminating in an unlawful search and seizure under the Constitution.

 In determining whether a traffic stop is reasonable under the Fourth Amendment, the Court applies the standard articulated in *Terry v. Ohio*, 392 U.S. 1 (1968), wherein the court asks 1. if the stop was "legitimate at its inception," *United States v. Hill*, 852 F.3d 377, 381 (4th Cir. 2017), and 2. if "the officer's actions during the seizure were reasonably related in scope to the basis for the traffic stop," *United States v. Williams*, 808 F.3d 238, 244 (4th Cir. 2015).  The Court found; *supra,* that the stop was legitimate at its inception.  Therefore, we move to the issue of whether Corporal Brantley and Officer Burke's actions during the seizure were reasonable.

 A traffic stop which is lawful to start can become unlawful if "it is prolonged beyond the time reasonably required to complete" the issuance of a ticket.  *Illinois v. Caballes*, 543 U.S. 405, 407 (2005).  "The permissible duration of a traffic stop is determined by the seizure's mission—to address the traffic violation that warranted the stop, meaning that it may last no longer than is necessary to effectuate that purpose."  *United States v. Bowman*, No. 16-4848, 2018 WL 1093942, at *5 (4th Cir. March 1, 2018) (quoting *Rodriguez v. United States*, 135 S.

6

Ct. 1609 (2015) (internal quotation marks omitted).  The possibility that a dog sniff might reveal drug possession is not, absent a showing of reasonable, articulable suspicion, a valid basis for extending a traffic stop. *Rodriguez*, 135 S.Ct at 1614-16.  Accordingly, legal seizure ends when tasks related to the traffic infraction are or reasonably should have been completed. *Rodriguez*, 135 S. Ct. at 1614.

The *Bowman* case, a recent Fourth Circuit opinion, has facts strikingly similar to those of the instant case.  The only significant factual difference is that here, the passengers of the vehicle were unable to produce a rental agreement.  Corporal Brantley gave them the option of calling the rental company and getting verification over the phone or by e-mail.  "Ordinary tasks incident to a traffic stop include 'inspecting a driver's identification and license to operate a vehicle, verifying the registration of a vehicle and existing insurance coverage, and determining whether the driver is subject to outstanding warrants.'"  *Bowman*, WL 1093942 at *5 (quoting *Hill*, 852 F.3d at 382).   Corporal Brantley testified that he had verified the validity of Mr. Gilmore's driver's license, verified the vehicle was properly registered and insured, and completed a written warning ticket for Mr. Gilmore's traffic infractions within the first few minutes of the stop.  However, he later testified that it was over 30 minutes into the stop before he returned Mr. Gilmore's driver's license and the insurance information.

Corporal Brantley testified that he could not let the vehicle leave without a rental agreement being produced, and the vehicle's occupants were never able to produce such an agreement.  He further testified that if they could not produce such an agreement, he would have no choice but to have the vehicle towed.  This is an incorrect statement of law.  Corporal Brantley testified that he ran the vehicle through dispatch early on and knew it was owned by Enterprise, a large, national, car rental company.  It was not reported stolen.  Therefore, Corporal

7

Brantley had no reason to believe that theft of a rental vehicle, a felony under West Virginia law, was a possibility here.  At most, Corporal Brantley could have cited Mr. Gilmore for unlawful retention of a rented or leased vehicle.  W. Va. Code § 17A-8-10.  Even so, that is a misdemeanor under West Virginia law, and Corporal Brantley had no reason to believe Mr. Gilmore was not in legal possession of the vehicle.  Corporal Brantley testified he did not know when the vehicle was due back other than what Ms. O'Brien told him.  Furthermore, the Fourth Circuit stated in *Williams* that they were "[m]indful that innocent travelers frequently extend rental agreements." *Williams*, 808 F.3d at 250.  Even had Corporal Brantley chosen to cite Mr. Gilmore under the West Virginia statute; no law, statute, or regulation the Court can find or is aware of also requires the vehicle to be towed, especially with only unsubstantiated suspicion of unlawful retention.  Additionally, West Virginia law expressly provides discretion to police officers to issue citations in lieu of arrest for any misdemeanor.  W. Va. Code § 62-1-5a.  Therefore, even if Corporal Brantley decided to tow the vehicle, the authority for the detention had ended.

As far as Corporal Brantley's argument that his continuing attempt to identify the Defendant extended the traffic stop, the Fourth Circuit has been clear that while officers are permitted to ask for identification of passengers during a traffic stop, they can do so only to the extent that it does not prolong the traffic stop.  *United States v. Guijon-Ortiz*, 660 F.3d 757, 764 (4th Cir. 2011).  An officer cannot "definitively abandon the prosecution of the traffic stop and embark on another sustained course of investigation" without other reasonable suspicion.  *Id*. at 766.  Extension of a stop for identification is only permissible with respect to the identification of the driver.

Accordingly, Corporal Brantley had some leeway to extend the stop beyond the time required to confirm the Mr. Gilmore's license was valid and issue him a citation for the initial traffic infractions in order to allow Mr. Gilmore to try to get the rental agreement by some other method.  However, the allowable time to extend the stop is not indefinite.  When it became clear to Corporal Brantley that Mr. Gilmore, for whatever reason, would not be able to produce a rental agreement, the purpose of the stop was over and Corporal Brantley should have either issued him a citation, or sent him on his way or had the vehicle towed.  What he was not allowed to do was continue the traffic stop under the rouse of allowing Mr. Gilmore even more time to find a rental agreement so that he could continue with his investigation into other crimes.  Therefore, the Court finds that the extension of the traffic stop was lawful to a point, but became unlawful prior to the initiation of the dog sniff, which is addressed in more detail below.

### C.   Search of the Vehicle

The Defendant argues that officers lacked articulable reasonable suspicion of criminal activity rendering Defendant's continued detention beyond the scope of the initial traffic stop unlawful.  Because the Defendant believes Corporal Brantley lacked reasonable suspicion, she argues that the canine sniff and resulting search of the vehicle would never have occurred had the traffic stop not been unlawfully extended.  This, Defendant argues, is a violation of her constitutional protection from unlawful search and seizure.

Temporary detention during a traffic stop constitutes a seizure even if it is only for a brief duration and for a limited purpose.  *Wren*, 517 U.S. at 809.  Accordingly, a traffic stop is subject to the reasonableness requirements of the Fourth Amendment.  *Id*. at 810.  Officers are permitted to conduct an investigation unrelated to the reasons for the initial stop provided it does not lengthen the stop.  *Rodriguez*, 135 S. Ct. at 1614.

During a traffic stop, a law enforcement officer can ask questions on topics unrelated to the traffic infraction as long as it does not lengthen a traffic stop that is otherwise completed simply to allow for these unrelated investigations to take place. *Williams*, 808 F.3d at 245; *see also Arizona v. Johnson*, 555 U.S. 323, 333 (2009). The same rule applies for a canine sniff around the outside of a vehicle. *Caballes*, 543 U.S. at 409. However, as addressed *supra*, a traffic stop becomes unlawful if extended beyond the time which "tasks tied to the traffic infraction are—or reasonably should have been—completed" even if only briefly. *Rodriguez*, 135 S. Ct. at 1614-16. The possibility that a dog sniff might reveal drug possession is not, absent a showing of reasonable, articulable suspicion, a valid basis for extending a traffic stop.

As discussed above, Corporal Brantley had already confirmed that the driver of the vehicle, Mr. Gilmore, had a valid license, and had written out a warning ticket for traffic infractions early in the stop. Additionally, the Court made a finding that an initially lawful extension of the traffic stop to allow Mr. Gilmore to find a rental agreement became unlawful once Corporal Brantley should have concluded that Mr. Gilmore could not produce a rental agreement, and taken whatever action he was going to take. This point was certainly reached prior to the dog sniff, which was not initiated until over 35 minutes after the stop was made.

Once the reason for the initial traffic stop is over, there are two ways officers can lawfully extended the detention. *Williams*, 808 F.3d at 245-46. First, it can be extended with the driver's consent. *Id*. There is nothing in the record, including Corporal Brantley's testimony, to suggest Mr. Gilmore, or either of the passengers for that matter, gave consent for the extension of the detention. To the contrary, Corporal Brantley testified that at no point in the stop was the Defendant or her fellow travelers free to leave. "An individual is seized when an officer 'by

means of physical force or show of authority, has in some way restrained [his] liberty.'"
*Bowman*, WL 1093942 at *6; (quoting *Terry*, 392 U.S. at 19).

Having found that consent is not in dispute, the Court turns now to the second reason an officer can exercisse lawful authority to continue detention, which is if he develops reasonable, articulable suspicion of ongoing criminal activity.  *United States v. Palmer*, 820 F.3d 640, 649-50 (4th Cir. 2016).

Reasonable suspicion is less demanding than probable cause or preponderance of the evidence.  *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000).  "Reasonable suspicion is a commonsense, nontechnical standard."  *Palmer*, 820 F.3d at 650.  "To show the existence of reasonable suspicion, 'a police officer must offer specific and articulable facts that demonstrate at least a minimal level of objective justification for the belief that criminal activity is afoot.'"  *Bowman*, WL 1093942 at *7; (quoting *United States v. Branch*, 537 F.3d 328, 337 (4th Cir. 2008)).  Courts look to the evidence as a whole to determine whether reasonable suspicion exists, not "whether each fact has been individually refuted…"  *Id*. at 336-37.

However, "the relevant facts articulated by the officers. . . must 'in their totality serve to eliminate a substantial portion of innocent travelers.'"  *Williams*, 808 F.3d at 246 (quoting *United States v. McCoy*, 513 F.3d 405, 413 (4th Cir. 2008)).  This does not mean that each fact on its own must eliminate innocent travelers, rather, the totality of the circumstances must demonstrate a "particularized and objective basis for suspecting wrongdoing," *Williams*, 808 F.3d at 246; *see also McCoy*, 513 F.3d at 413.

In Corporal Brantley's report on this matter, he says that due to the "aggregate, it appeared criminal activity was afoot."  ECF No. 17-1 at 2.  During his testimony, he referred several times to the "totality of everything" or the "totality of circumstances" as raising his

suspicion.  A Court's inquiry must take into account the totality of the circumstances, not employ a "divide-and-conquer analysis."  *Williams*, 808 F.3d at 247.  That being said, a Court must "address each of these factors before evaluating them together with the other circumstances of the stop" when considering factors listed by a police officer that he says gave him reasonable suspicion.  *United States v. Powell*, 666 F.3d 180, 187-88 (4th Cir. 2011).  Accordingly, the Court will address each factor Corporal Brantley raised separately before considering them in totality.

<u>**Factors**</u>

1.    Passengers Being From Different States

Corporal Brantley purports that the fact that all three individuals in the vehicle claimed to be from different states raised his suspicion level.  Corporal Brantley testified that this was especially true given that Florida, where Ms. O'Brien told him the Defendant was from, is far away from New York and New Hampshire where Ms. O'Brien and Mr. Gilmore were from.

Corporal Brantley conceded that this fact, taken alone, was not suspicious.  Rather, he testified that this in conjunction with the "totality of the circumstances" made it suspicious. Corporal Brantley also conceded that it is possible that someone could travel from Florida to the Northeast to take a road trip with friends.  Furthermore, the Government and Corporal Brantley failed to articulate what significance such a fact normally has, or what inferences can be draw from such a fact as it relates to narcotics trafficking, which is the criminal activity Corporal Brantley intimated he initially suspected.  The Fourth Circuit in *Bowman* indicated that one seemingly innocuous factor, without more, is accorded very little weight.  *Bowman*, WL 1093942 at *11.

2.    Vehicle Being a Rental Vehicle and Length of Rental/Trip

Corporal Brantley testified that the fact the vehicle was a rental also raised his level of suspicion, although he admits that "[t]hat alone is not suspicious."  Corporal Brantley testified this is because he believes it is a common practice among narcotics traffickers to use rental vehicles so that if they are caught and the vehicle is seized, it is less of a burden to them than if their own vehicle were to be seized.  He also indicated that the length of the rental, which Ms. O'Brien told him was two days, was suspicious.

"[A]s a general proposition, some drug traffickers use rental cars", but use of a rental car is "of minimal value to the reasonable-suspicion evaluation" because "the overwhelming majority of rental car drivers . . . are innocent travelers with entirely legitimate purposes." *Williams*, 808 F.3d at 247.  Accordingly, this factor alone is given little weight. *Id*.  Whether considered the same factor, or a separate factor, the length of the rental and trip is subject to the same line of reasoning; namely, the overwhelming majority of short trips, even those long in distance, are made by innocent travelers.

3.      Lack of Ability to Name Friends

Corporal Brantley was also suspicious that Ms. O'Brien could not give full names of the mutual friends they went to Columbus to visit—their stated purpose for the trip.  Corporal Brantley testified that initially, Ms. O'Brien could not produce any names.  At some point they did provide names, albeit only first names.  Corporal Brantley did concede that it was possible that the people in Columbus were more friends of Mr. Gilmore than Ms. O'Brien and that could explain her not being able to identify them.

Much like the issue of the passengers being from different states, the Government did little to explain why not being able to provide last names of the people they claimed to be visiting in Columbus caused Corporal Brantley to be suspicious that the vehicles' occupants

13

were involved in drug or other criminal activity.  Again, one seemingly innocuous factor, without more, is accorded very little weight.  *Bowman*, WL 1093942 at \*11.

    4.    Eye Contact

Corporal Brantley also mentioned "limited eye contact" between himself, and Mr. Gilmore and Ms. O'Brien as having raised his level of suspicion.  He attributed the lack of eye contact to nervousness on the part of both.  However, he concedes that too little eye contact or too much eye contact can be suspicious depending on the circumstances.

"There is nothing intrinsically suspicious or nefarious about the occupant of a vehicle not making eye contact with an officer during a traffic stop.  *Bowman*, WL 1093942 at \*9.  Indeed, the Fourth Circuit has said that "[g]iven the complex reality of citizen-police relationships . . . , a young man's keeping his eyes down during a police encounter seems just as likely to be a show of respect and an attempt to avoid confrontation."  *United States v. Massenburg*, 654 F.3d 480, 489 (4th Cir. 2011).  Corporal Brantley failed to explain why this behavior was suggestive of criminal activity.  Rather, he simply attributed it to nervousness and said it increased his suspicion.  "To support a finding of reasonable suspicion, we require the detaining officer to . . . articulate why a particular behavior is suspicious . . ."  *Williams*, 808 F.3d at 246.  Lack of eye contact "is not particularly probative of a suspect's nervousness."  *Id*.  Adding to the perplexing nature of this argument and Corporal Brantley's testimony, the Government has in some instances argued "just the reverse: that it is suspicious when an individual looks or stares back at officers."  *Massenburg*, 654 F.3d at 489.

5.      Nervousness

Aside from limited eye contact, Corporal Brantley also cited more general nervousness as a factor in his suspicion.  Specifically, he said Ms. O'Brien was exhibiting signs of nervousness in that she was shaking.

Although nervous behavior is relevant to the determination of reasonable suspicion, nervousness on its own "is of limited value to reasonable suspicion analysis . . ." *Massenburg*, 654 F.3d at 490; *see also Palmer*, 820 F.3d at 652-53.  The Fourth Circuit offered this explanation of why that is so: "a driver's nervousness is not a particularly good indicator of criminal activity, because most everyone is nervous when interacting with the police." *Id*.  More applicable to the issue of reasonable suspicion, the same Court stated that "[i]t is common for most people to exhibit signs of nervousness when confronted by a law enforcement officer whether or not the person is currently engaged in criminal activity.  Thus, absent signs of nervousness beyond the norm, we will discount the detaining officer's reliance on the detainee's nervousness as a basis for reasonable suspicion." *Massenburg*, 654 F.3d at 490.

Nothing in Corporal Brantley's testimony leads the Court to believe there were any exhibited signs or nervousness "beyond the norm." Indeed, Corporal Brantley testified that Ms. O'Brien did not "appear to be shaking as much as she did when she was separated from the vehicle" as she did the rest of the time.  That Ms. O'Brien was shaking more when outside the vehicle lends itself to the theory espoused by Defendant that Ms. O'Brien could simply have been cold.  Weather reports from the day indicate it was in the mid to upper 50s during the traffic stop.  The traffic stop took place on the side of the interstate with tractor trailers passing often.  Additionally, Ms. O'Brien and the Defendant appear to be cold in the dash cam video, even

retrieving a blanket from the vehicle which they can be seen huddled under at times.  Like the others, this factor alone does not support a finding of reasonable suspicion.

      6.      Different Answers Given When Asked Where They Had Been

Corporal Brantley testified that when he asked where the three occupants of the vehicle were coming from, Ms. O'Brien and Mr. Gilmore answered simultaneously, with Ms. O'Brien saying they were coming from Columbus, Ohio and Mr. Gilmore saying they were coming from Hilliard, Ohio.

Once again, the Government neglects to explain why this caused Corporal Brantley to suspect that the three were involved in narcotics trafficking or some other crime rather than simply being confused about where exactly they had been in a state that Corporal Brantley knew was several hundred miles away from their home.  Corporal Brantley also testified that Ms. O'Brien told him it was her "first road trip", seemingly making such an explanation even more plausible. The Fourth Circuit in *Bowman* said, when referring to a Defendant not being able to tell police exactly where he had been that "[u]nder those circumstances, it would be perfectly consistent with innocent travel for a person to rely on a GPS system to navigate and still not know precisely where he had been."  *Bowman*, WL 1093942 at *10.  Furthermore, a simple internet search would explain that Hilliard is a suburb of Columbus; therefore, both answers could accurately describe where they had been.

      7.      High-Intensity Drug Trafficking Area

The Court wishes to briefly address Corporal Brantley repeated use of the term "high-intensity drug trafficking area" to describe Interstate 70 where the traffic stop occurred. Corporal Brantley intimated on multiple occasions that since the interstate in question was a

known drug trafficking route, his suspicions were even more easily triggered than they would have been otherwise.  Corporal Brantley cited this as a reason for asking investigatory type questions not at all related to the reason for the traffic stop almost immediately on making contact with the occupants of the vehicle.

In *Williams*, the Government cited the interstate being traveled on by Defendant as a "known drug corridor", listing that as one factor, among others, giving rise to reasonable suspicion.  *Williams*, 808 F.3d at 247.  In response, the Fourth Circuit stated that "[s]imilar to traveling in a rental car, however, the number of persons using the interstate highways as drug corridors pales in comparison to the number of innocent travelers on those roads."  *Id*.  The same applies in the instant case.

### Totality of the Circumstances

Reasonable suspicion may exist even if each fact standing alone is susceptible to an innocent explanation."  *McCoy*, 513 F.3d at 413-14.  Since "[s]tanding alone, none of the foregoing factors provides a basis for a reasonable, articulable suspicion" that criminal activity was afoot, we now "must consider all of the factors together."  *Bowman*, WL 1093942 at *12.

In this case, using the roadmap established by *Bowman*, even combining all the factors espoused by the Government and Corporal Brantley, this Court perceives no basis for a reasonable suspicion that would lead Corporal Brantley to reasonably believe the Defendant or the vehicles' other passengers were involved in criminal activity.  At least not prior to when the reason for the traffic stop was complete, and the detention should have lawfully been over.  This is because "[u]nder the applicable standard, the facts, in their totality, should eliminate a substantial portion of innocent travelers."  *Williams*, 808 F.3d at 251.  The factors in this case would not do so.

Lastly, even if granted that the totality of the circumstances could be construed as somewhat suspicious, the Government has failed to explain why such behavior "is likely to be indicative of some more sinister activity than may appear at first glance." *Id*. "Although the nature of the totality-of-the-circumstances test makes it possible for individually innocuous factors to add up to reasonable suspicion, it is 'impossible for a combination of wholly innocent factors to combine into a suspicious conglomeration unless there are concrete reasons for such an interpretation.'" *Bowman*, WL 1093942 at *12 (quoting *Williams*, 808 F.3d at 251).  In the instant case, no such concrete reasons have been provided.

It is the Government's burden to articulate facts sufficient to support reasonable suspicion.  *Brown v. Texas*, 443 U.S. 47, 52, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979).  They have failed to do so.  Therefore, the Court recommends that Defendant's Motion to Suppress Search be granted.

**D.**     **Defendant's Motion to Suppress Statements**

When a subject is interrogated while in custody, a *Miranda* warning is required.  *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).  Under the preponderance of the evidence, the Government has the burden to show that the Defendant waived her *Miranda* rights. *United States v. Robinson*, 404 F.3d 850, 860 (4th Cir. 2005).

It is undeniable this nearly two hour encounter was beyond the brief detention of a traffic stop.  The Government concedes as much.  ECF No. 22 at 4 ("[t]he defendant is correct when she alludes to the fact, by the time the defendant spoke with Officers and made admissions, the situation had evolved beyond a routine traffic stop").  Furthermore, Corporal Brantley testified that at no point in the nearly two hour process was the Defendant, or anyone else in the car, free to leave.  In *Miranda*, the test for determining whether an individual is in custody is whether

18

under the totality of the circumstances, the "suspect's freedom of action is curtailed to a degree associated with formal arrest." While the Government makes much of the fact that the Defendant and her travel companions were allowed to use their phones and smoke cigarettes, the traffic stop was over and they were not free to leave. "The operative question is whether, viewed objectively, 'a reasonable man . . . would have understood his situation' to be one of custody." United States v. Colonna, 511 F.3d 431, 435 (4th Cir. 2007) (quoting Berkemer v. McCarty, 468 U.S. 420, 422 (1984)). The Court believes given that they were confined to a guardrail along the highway for over an hour after being made to exit their vehicle, and were not free to leave, the average person in Defendant's position would believe themselves to be in custody.

The Government argues that the reason Defendant was not allowed to leave at any point was because the officers had by that time developed reasonable suspicion of criminal activity. *Id*. In lieu of the foregoing analysis, this argument does not hold. While reasonable suspicion has been held to warrant temporary seizure, *United States v. Leshuk*, 65 F.3d 1105, 1110 (4th Cir. 1995), the authority for temporary seizure goes out the window along with the reasonable suspicion. Therefore, under *Miranda*, officers were required to read the Defendant her rights prior to questioning.

The Government also makes the argument that the statements were voluntarily made since they say the Defendant approached Corporal Brantley and asked to talk prior to making the incriminating statements. The Government says in their reply to the motion that this is so, and Corporal Brantley said several times in his testimony that it is "clear in the video" that the Defendant pulled him aside. Having watched that portion of the video closely several times, the Court disagrees. Furthermore, Corporal Brantley's police report on the matter seems to indicate that he initiated the conversation. All that is clear from the video is that Corporal Brantley and

the Defendant are standing a few feet apart near other officers and the other occupants of the vehicle, and then the two of them separate from the group and go to the front of the suspect vehicle.  What is not seen is the Defendant asking to speak with Corporal Brantley.  Perhaps this would have been clear had Corporal Brantley's body camera been powered on, alas it was not.

Lastly, even if the Defendant did pull Corporal Brantley aside and volunteer her name and date of birth, Corporal Brantley testified he then went back to his cruiser to run the information.  This took several minutes.  When he came back out to speak to the Defendant again after doing so, he would still then owe her the *Miranda* warnings before questioning her further.  For these reasons, the Court recommends that the Defendant's Motion to Suppress Statements be granted.

## V.   RECOMMENDATION

The Court **RECOMMENDS** that:

1.   The Defendant's [ECF No. 16] Motion to Suppress Statements be **GRANTED**.

2.   The Defendant's [ECF No. 17] Motion to Suppress Search of Vehicle for Unreasonable Extension of the Traffic Stop be **GRANTED**.

3.   The Defendant's [ECF No. 25] Supplemental Motion to Suppress Search of Vehicle for Illegal Traffic Stop be **DENIED** because the initial traffic stop was lawful, and the Supplemental Motion to Suppress the Search for Unreasonable Extension of the Traffic Stop be **DENIED AS MOOT**.

Any party who appears *pro se* and any counsel of record, as applicable, may, within fourteen days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection.

A copy of such objections should be submitted to the District Court Judge of Record. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985): *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

The Clerk of the Court is **DIRECTED** to provide a copy of this Report and Recommendation to parties who appear *pro se* and all counsel of record, the United States Marshal Service, and the United States Probation Office, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

Dated: March 8, 2018                         /s/ *James E. Seibert*
                                             JAMES E. SEIBERT
                                             UNITED STATES MAGISTRATE JUDGE