IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

UNITED STATES OF AMERICA,

        Plaintiff,

v.                          Criminal Action No. 5:17CR35
                                       (STAMP)
STEPHANIE LEE KENYON,

        Defendant.


**MEMORANDUM OPINION AND ORDER**
**AFFIRMING AND ADOPTING IN PART AND DECLINING TO ADOPT IN PART**
**THE REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE,**
**SUSTAINING THE OBJECTIONS IN PART AND OVERRULING THE**
**OBJECTIONS IN PART TO THE REPORT AND RECOMMENDATION,**
**GRANTING DEFENDANT'S MOTION TO SUPPRESS STATEMENTS,**
**DENYING DEFENDANT'S MOTION TO SUPPRESS SEARCH OF VEHICLE**
**FOR UNREASONABLE EXTENSION OF THE TRAFFIC STOP AND**
**DENYING DEFENDANT'S SUPPLEMENTAL MOTION TO SUPPRESS**
**SEARCH OF VEHICLE FOR ILLEGAL TRAFFIC STOP**

I.  <u>Introduction</u>

The defendant, Stephanie Lee Kenyon, was named in a two-count indictment with a forfeiture allegation in the above-styled criminal action. The indictment charges the defendant with identity fraud and interstate transportation of stolen property in violation of 18 U.S.C. §§ 1028(a)(3) and 1028(b)(2)(B) and § 2314.

For the following reasons, this Court affirms and adopts in part and declines to adopt in part the report and recommendation of the magistrate judge (ECF No. 37). Further, this Court sustains in part and overrules in part the government's objections to the report and recommendation (ECF No. 40).

This Court grants the defendant's motion to suppress statements (ECF No. 16), denies the defendant's motion to suppress search of vehicle for unreasonable extension of the traffic stop (ECF No. 17), and denies the defendant's supplemental motion to suppress search of vehicle for illegal traffic stop and unreasonable extension of the traffic stop (ECF No. 25).

## II.  Background

On May 13, 2017, Corporal Sean Brantley of the Wheeling Police Department conducted a traffic stop of a white Ford Expedition which was traveling east on Interstate 70.  After pursuing the vehicle for roughly ten miles, the stop was effectuated around mile marker 7 at 10:16 a.m. on that date.

The occupants of the vehicle were a male driver, Mr. Gilmore; a female passenger, Ms. O'Brien; and the defendant, Stephanie Kenyon, who was initially unidentified and lying across the back seat with a blanket covering her.  Officer Brantley, after speaking briefly to the front seat passengers,[1] asked for registration and proof of insurance for the vehicle, as well as identification for all three occupants.  During this time, he also began asking questions about where they had been, why they had been there, and where they were going.

---

[1]The discussion is inaudible due to the officer's body microphone not being engaged while he is out of the cruiser.

Upon request, the front seat passengers produced identifications. The front seat passenger identified herself as Courtney O'Brien ("O'Brien"), and the driver as James Gilmore ("Gilmore"). For identification, O'Brien produced a New Hampshire license, and Gilmore produced a New York license. Officer Brantley was informed that the backseat passenger did not have identification. O'Brien stated that the passenger in the backseat was from Florida and that her name was "Leah Whitmil," and provided a date of birth. The passengers were not able to produce the rental agreement for the vehicle.

Officer Brantley returned to his cruiser at 10:23 a.m. Officer Brantley exited his cruiser and approached the passenger side of the Expedition again at 10:24 a.m. After speaking with the passengers in the vehicle, Officer Brantley again returned to his cruiser at 10:28 a.m. Inside the cruiser, Officer Brantley states on the radio, "they can't locate the rental agreement" and calls in the vehicle's license plate number.

At approximately 10:28 a.m., Officer Erick Burke arrived on the scene. Officer Brantley filled him in on his observations of what was taking place and what he had observed, and Officer Burke then spoke to the passengers as well. Officer Burke approached the vehicle at 10:30 a.m. and had O'Brien exit the vehicle at 10:31 a.m. while Officer Brantley continued to check on the validity of the driver and passengers' identification from his cruiser.

By 10:33 a.m., the police dispatcher had advised Officer Brantley that Gilmore and O'Brien had produced valid identifications, but was unable to find any record under the name and date of birth that had been provided for the back seat passenger, the defendant. At approximately 10:36 a.m., Officer Brantley stated on the radio that he will attempt to get better information on the identification of the backseat passenger.

After Officer Burke spoke with O'Brien, he spoke again with Officer Brantley. At this point, the officers discussed the information they had gathered and decided to ask the driver to exit the vehicle and to conduct a canine sniff of the vehicle. Officer Brantley again noted that he does not have an identification for the rear passenger.

At 10:40 a.m., Gilmore exited the vehicle and spoke with Officer Burke. Officer Burke then approached the passenger side of the Expedition and had the defendant exit the vehicle. The defendant exited the vehicle at 10:49 a.m. At this point, the individuals that were passengers in the Expedition were seated on the guardrail, smoking cigarettes, and using cell phones to attempt to provide the rental car agreement.

Officer Brantley then walked his canine, Jericho, around the vehicle at 10:51 a.m. The canine "alerted", by sitting down near the rear passenger side door of the vehicle. After the canine

"alerted" at 10:53 a.m., Officer Brantley proceeded to perform a search of the Expedition.

Officer Brantley found various types of large bags in the rear of the vehicle. The officer asked the passengers to identify which bags belonged to whom. The passengers all did so until it came time to claim ownership of two Nike duffel bags, which appeared to be new with tags still on them. Officer Brantley described these bags as being very heavy. When asked who the duffel bags belonged to, none of the passengers initially claimed ownership, eventually claiming the bags belonged to all of them. Officer Brantley asked them what was inside. Gilmore responded that it was electronics.

Officer Brantley opened the bags. Officer Brantley discovered driver's licenses, credit cards, and various Apple computer products including laptops and watches in their original packaging. The seizure of the identification cards, credit cards and Apple computer equipment serve as the basis for the instant charges against the defendant.

At some point while Officer Brantley was going through the electronics, O'Brien claimed ownership of the duffel bags containing the electronics, and claimed to have purchased them on eBay. At 11:37 a.m., three officers were standing between the police cruiser and the Expedition, facing the passengers seated on the guardrail. Officer Brantley placed several cell phones on the hood of his police cruiser. The defendant raised her arm and

indicated toward the Expedition. Officer Brantley then pointed to the area in front of the Expedition and the defendant followed Officer Brantley in that direction. Officer Brantley and the defendant engaged in conversation at the front of the rental vehicle.

Officer Brantley returned to his cruiser to check with the dispatcher regarding the true name and date of birth of the defendant at 11:45 a.m. At this time, O'Brien was in the back of Officer Brantley's cruiser. At 11:50 a.m., Officer Brantley learned from the dispatcher that the information checked out on a Stephanie Kenyon, who was wanted for receiving stolen property.

Officer Brantley then returned to the front of the vehicle and again engaged in conversation with the defendant. This ultimately led the defendant to make several incriminating statements about her involvement with the possession and acquisition of the items discovered in the Nike bags.

### III. Procedural History

Counsel for the defendant filed a motion to suppress statements (ECF No. 16), motion to suppress search of vehicle for unreasonable extension of the traffic stop (ECF No. 17), and a supplemental motion to suppress search of vehicle for illegal traffic stop and unreasonable extension of the traffic stop (ECF No. 25).

The government then filed a response in opposition to defendant's motion to suppress statements (ECF No. 22), response in opposition to defendant's motion to suppress search of vehicle for unreasonable extension of the traffic stop (ECF No. 21), and response in opposition to defendant's supplemental motion to suppress search of vehicle for illegal traffic stop and unreasonable extension of the traffic stop (ECF No. 27).

United States Magistrate Judge James E. Seibert held a hearing on the defendant's motions on February 2, 2018. Magistrate Judge Seibert then held a continued evidentiary hearing on the defendant's motions on February 21, 2018. After the evidentiary hearing and continued evidentiary hearing, the magistrate judge then entered a report and recommendation. ECF No. 37.

The magistrate judge was unpersuaded by the defendant's initial argument as to the traffic stop, finding "the traffic stop, at its inception, to be routine." Id. at 5. Next, the magistrate judge found that "that the extension of the traffic stop was lawful to a point, but became unlawful prior to the initiation of the dog sniff." Id. at 9. The magistrate judge then addressed each factor that Officer Brantley raised in support of reasonable suspicion separately and found, considering the totality of these factors, "no basis for a reasonable suspicion that would lead Corporal Brantley to reasonably believe the Defendant or the vehicles' other passengers were involved in criminal activity." Id. at 18.

7

Lastly, the magistrate judge determined that "the average person in Defendant's position would believe themselves to be in custody" and that "under Miranda, officers were required to read the Defendant her rights prior to questioning." Id. at 19. The magistrate judge disagreed with the government's assertion that the statements were voluntarily made by the defendant and notes that "Corporal Brantley's police report on the matter seems to indicate that he initiated the conversation." Id. The magistrate judge then stated that "even if the Defendant did pull Officer Brantley aside and volunteer her name and date of birth," Officer Brantley "would still then owe [the defendant] the Miranda warnings before questioning her further" after he "went back to his cruiser to run the information," which was several minutes later. Id. at 20.

For these reasons, the magistrate judge recommended that the defendant's motion to suppress statements (ECF No. 16) be granted, the defendant's motion to suppress search of vehicle for unreasonable extension of the traffic stop (ECF No. 17) be granted, the defendant's supplemental motion to suppress search of vehicle for illegal traffic stop (ECF No. 25) be denied because the initial traffic stop was lawful and the supplemental motion to suppress the search for unreasonable extension of the traffic stop be denied as moot. ECF No. 37 at 20.

The government filed objections to the magistrate judge's report and recommendation. ECF No. 40. Initially, this Court

notes that the government's rendition of the facts in its objections to the report and recommendation vary and differ from the factual findings of the magistrate judge in his report. The government, in its objections, notes a general objection to the magistrate judge's reliance on three cases, namely <u>Bowman</u>,[2] <u>Rodriguez</u>,[3] and <u>Williams</u>,[4] and points out that these cases are "factually distinguishable from the instant case" and are "of limited value to the analysis" in that "[i]n all three of those cases, the Officers developed reasonable suspicion <u>after</u> the traffic stop had concluded." ECF No. 40 at 8 (emphasis in original).

The government further disputes the magistrate judge's characterization of <u>Bowman</u> as "strikingly similar" to the instant case, and points out that here, the officer "was still diligently trying to verify the identification of a back seat passenger, a task complicated by O'Brien's obstruction, and trying to verify that Gilmore (the driver) was allowed to be in possession of the

---

[2]<u>United States v. Bowman</u>, 884 F.3d 200 (4th Cir. 2018). Additionally, to the extent the government raises an issue that "as to <u>Bowman</u>, it is difficult to comprehend why the Magistrate Judge would choose to rely so heavily on one unpublished case as a 'roadmap' for his analysis" (ECF No. 40 at 9), this Court notes that <u>Bowman</u> is, in fact, a published opinion.

[3]<u>Rodriguez v. United States</u>, 135 S. Ct. 1609 (2015)

[4]<u>United States v. Williams</u>, 808 F.3d 238 (4th Cir. 2015)

car" and "had not yet completed the mission of the stop." <u>Id.</u> at 9.

The government then asserts that the magistrate judge's report and recommendation "is in error in so far as it concludes that the Officers had impermissibly extended the traffic stop" because "[t]hey had not yet completed the ordinary incidents of a traffic stop when they developed reasonable suspicion of criminal activity." ECF No. 40 at 10. In support of the argument that "the traffic stop did not exceed the time reasonably required to complete the tasks incident to the mission of the stop" (<u>Id.</u> at 15), the government asserts the following reasons: (1) the need to identify the occupants; (2) obstruction of justice by the passengers; and (3) the need to determine if Gilmore was authorized to be driving the car. The government contends that "[t]here was no impermissible extension of the stop" because "the Officers in this case acted with reasonable diligence" and "[t]he mission of the stop had still not been completed through no fault of their own." <u>Id.</u> at 15.

The government also asserts that "[t]he Magistrate Judge's decision is also in error because it fails to recognize that the Officers had developed reasonable suspicion prior to the dog sniff" and contends that "[i]n a totality of the circumstances analysis, it is not appropriate to address the factors piecemeal, in a vacuum, and out of context." <u>Id.</u> at 15-16. The government then

10

"endeavor[s] to re-visit [the factors] (using the same titles employed by the Magistrate Judge) in an effort to show how they are inadequately addressed in the R&R." Id. at 16. The government then addresses "several factors which heavily influenced the Officers' assessment of reasonable suspicion, but which receive no mention in the R&R." Id. at 21.

Lastly, the government asserts in its objections that "[t]he Magistrate Judge's decision is also in error because it concludes that the defendant's statements to Cpl. Brantley should be suppressed because they were not Mirandized." Id. at 25. Ultimately, the government "maintains that the occupants were not in custody" and "[s]ince the defendant was not in custody, no Miranda warnings were required." Id. at 27. The government additionally asserts that "even if the defendant could be deemed to have been in custody, no warnings were required because the defendant's statements were completely voluntary." Id.

## IV.  Applicable Law

Under 28 U.S.C. § 636(b)(1)(C), this Court must conduct a de novo review of any portion of the magistrate judge's recommendation to which an objection is timely made. Because the government filed objections to the report and recommendation, the magistrate judge's recommendation will be reviewed de novo as to those findings to which objections were made. As to those findings to which objections were not filed, the findings and recommendations will be

upheld unless they are "clearly erroneous or contrary to law." 28
U.S.C. § 636(b)(1)(A).

## V. Discussion

This Court has conducted a de novo review of the magistrate
judge's report and recommendation as to those findings to which the
government has made objections. Following its review and
consideration of the evidence presented in this matter, including
the dash camera video footage from Officer Brantley's cruiser, the
police reports by Officer Burke and Officer Brantley, and the
testimony of these officers, as well as the defendant's motions,
the government's responses, the report and recommendation of the
magistrate judge, and the government's objections, this Court finds
as follows:

## A. Initial Traffic Stop

The Court notes no objection by the government to the portion
of the magistrate judge's report and recommendation concerning the
initial traffic stop of the vehicle in which the defendant was a
passenger. The magistrate judge correctly found "this issue to be
straightforward and the traffic stop, at its inception, to be
routine." ECF No. 37 at 5. The magistrate judge correctly found
that the defendant presents no evidence but, rather, makes only
assertions and suggestions to support the claim that Officer
Brantley did not have probable cause to believe a traffic violation
had occurred. An officer's "decision to stop an automobile is

reasonable where the police have probable cause to believe that a traffic violation has occurred." Whren v. United States, 517 U.S. 806, 809 (1996). As the magistrate judge correctly determined, Officer Brantley had probable cause to believe multiple traffic violations had occurred, thus rendering the initial traffic stop valid. This Court finds no clear error in any of the above determinations of the magistrate judge and thus upholds his ruling on the initial traffic stop.

B.   Extension of the Traffic Stop and Search of the Vehicle

The Fourth Amendment prohibits "unreasonable searches and seizures." U.S. Const. Amend. IV. Temporary detention of individuals during a traffic stop constitutes a seizure and must not be "unreasonable" under the circumstances. Whren v. United States, 517 U. S. 806, 809-10 (1996).

Because an ordinary traffic stop is more analogous to an investigative detention than a custodial arrest, the Court analyzes the propriety of a traffic stop using the dual inquiry announced in the Supreme Court's holding in Terry v. Ohio, 392 U.S. 1, 19-20, 88 S. Ct. 1868 (1968). See United States v. Rusher, 966 F.2d 868, 875 (4th Cir. 1992).

This Court has conducted a de novo review of the portion of the magistrate judge's report and recommendation concerning defendant's motion to suppress search of the vehicle and

unreasonable extension of the traffic stop[5] and the government's objections thereto, and finds as follows.

First, for the reasons stated above, this Court finds that Officer Brantley's action of stopping the Expedition was justified at its inception. <u>Terry v. Ohio</u>, 392 U.S. 1, 20 (1968). Officer Brantley had probable cause to believe multiple traffic violations had occurred, thus rendering the initial traffic stop valid.

Second, this Court must analyze whether the officer's subsequent actions were reasonably related in scope to the circumstances that justified the stop. <u>Id.</u> A police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures. <u>Rodriquez v. United States</u>, 135 S. Ct. 1609, 1612 (2015). A seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission. <u>Illinois v. Caballes</u>, 543 U.S. 405, 407, 125 S. Ct. 834, 837 (2005). Beyond determining whether to issue a traffic ticket, an officer's mission includes ordinary inquiries incident to the stop. <u>Id.</u> at 408. The authority for the seizure ends when tasks tied to the traffic infraction are, or reasonably should have been,

---

[5]The defendant does not claim that the search itself constituted a violation of her Fourth Amendment rights, but rather focuses on the extension of the stop (i.e., the seizure of her person).

completed. <u>Rodriguez v. United States</u>, 135 S. Ct. 1609, 1614 (2015). Of course, if the driver obstructs the police officer's efforts in any way — for example, by providing inaccurate information — a longer traffic stop would not be unreasonable. <u>United States v. Branch</u>, 537 F.3d 328, 336 (4th Cir. 2008) (citing <u>United States v. Sharpe</u>, 470 U.S. 675, 687–88, 105 S. Ct. 1568 (1985)).

This Court finds that the traffic stop at issue was reasonable in scope as the officer was performing routine duties and ordinary inquiries incident to the traffic stop such as requesting identification from the passengers, checking the driver's license, determining whether there are outstanding warrants, and requesting documentation as to the rental vehicle agreement. <u>Green</u>, 740 F.3d 275; <u>Rodriguez</u>, 135 S. Ct. at 1615. Here, after realizing that the vehicle was a rental car, Officer Brantley asked to see the rental agreement in order to determine whether Gilmore was authorized to be driving the car. The occupants were unable to produce a copy of the rental agreement. It was permissible for the officer to make inquiries as to the passengers, including the defendant, and other matters, because the officer did not extend the stop to make these inquiries. <u>See</u> <u>Arizona v. Johnson</u>, 555 U.S. 328, 333 (2009). Officer Brantley, after permitting the driver to use his cell phone in order to attempt to provide documentation, was engaged in the

process of waiting for the driver to produce confirmation of the vehicle rental agreement.

At the hearing on the motions to suppress, Officer Brantley testified as follows:

> Q.   Not being able to ascertain whether or not Mr. Gilmore was allowed to be driving that car, would you have been permitted as an officer to simply send him on his way with either a citation or a warning?
> A.   No.
> Q.   What would you have to do?
> A.   We'd tow the vehicle, if we cannot prove the person that's allowed to be driving the vehicle or authorized to be driving the vehicle.

ECF No. 38 at 23.

. . .

> Q.   Throughout the entire time you were there with them at the side of the road, did at any point Mr. Gilmore produce a copy of the rental agreement?
> A.   He did not.
> Q.   And at any point did he manage to get, say, oral verification from talking with a representative of the company?
> A.   He did not.

ECF No. 38 at 24.

A lawful traffic stop "begins when a vehicle is pulled over for investigation of a traffic violation" and ends "when the police have no further need to control the scene, and inform the driver and passengers they are free to leave." <u>United States v. Green</u>, 740 F.3d 275, 279 (4th Cir. 2014) (quoting <u>Arizona v. Johnson</u>, 555 U.S. 323, 333, 129 S. Ct. 781 (2009)).

Officer Brantley was unable to ascertain whether Gilmore was permitted to drive the Expedition, never received any proof of the

16

rental agreement, and was attempting to identify the passengers in the vehicle despite being providing inaccurate and misleading information. Further, the officer testified that he was unable to issue a citation or warning until he confirmed such information.

The stop at issue was reasonable in duration considering the obstruction of Officer Brantley's efforts by providing inaccurate information and prolonging the stop. Branch, 537 F.3d at 336. In this case, Officer Brantley was faced with O'Brien's statements that the rear passenger (the defendant) was sleeping and did not have any identification, but was named "Leah Whitmil," that Whitmil's date of birth was 06-12-81, and that Whitmil was from Florida, as well as Gilmore's inability to provide any proof that he was authorized to be driving the rental vehicle. As a result of this false information, the officer was unable to handle the stop expeditiously.

During cross-examination by counsel for the defendant during the hearing on the motions to suppress, Officer Brantley responded to defense counsel's inquiry regarding whether or not a traffic citation was going to be issued to the driver, as follows:

> Q.   You said [Gilmore] was still attempting to contact Enterprise, but you're going to write him the ticket?
> A.   It was not a ticket.  It was a written warning for the violations, anticipating that he would locate the rental agreement so he could be on his way.

ECF No. 38 at 69.

The magistrate judge states in his report and recommendation, "[w]hen it became clear to Corporal Brantley that Mr. Gilmore, for whatever reason, would not be able to produce a rental agreement, the purpose of the stop was over and Corporal Brantley should have either issued him a citation, or sent him on his way or had the vehicle towed."  ECF No. 37.  This Court agrees.  However, the evidence at hand does not show that it "became clear" to Officer Brantley that Gilmore, or any of the passengers, at any time, would be unable to produce the rental agreement for the vehicle.  There was no impermissible extension of the stop because the officers acted with reasonable diligence in trying to determine if Gilmore was authorized to be driving the vehicle, and the mission of the stop was delayed by the inaccurate and misleading information provided by the passengers.  This Court finds that, in this case, the traffic stop's task had not been completed, and that Officer Brantley had not issued a citation for the traffic infractions when the officers developed reasonable suspicion to extend the stop and conduct a canine sniff of the car.

Officer Brantley testified that in light of everything he had heard and seen up to that point, he believed that he had reasonable suspicion of criminal activity and decided to conduct a canine sniff around the exterior of the vehicle.  The audio captured on the police cruiser video also recorded Officer Burke suggesting that a canine sniff be conducted on the Expedition.

If a traffic stop is extended in time beyond the period that the officers are completing tasks related to the traffic infractions, the officers must either obtain consent from the individuals detained or identify reasonable suspicion of criminal activity to support the extension of the stop. United States v. Hill, 852 F.3d 377, 381 (4th Cir. 2017) (citing Williams, 808 F.3d at 245-46). Once an officer has reasonable suspicion of illegal activity, the officer may prolong a stop beyond the scope of the traffic violation in an attempt to confirm or dispel his suspicion. United States v. Green, 740 F.3d 275, 280 (4th Cir. 2014). The determination of reasonable suspicion must be based on common sense judgments and inferences about human behavior. Illinois v. Wardlow, 528 U.S. 119, 125, 120 S. Ct. 673, 676 (2000).

In Officer Brantley's report on this matter, he says that due to the "aggregate, it appeared criminal activity was afoot." ECF No. 17-1 at 2. During his testimony, he referred several times to the "totality of everything" or the "totality of circumstances" as raising his suspicion. This Court's inquiry must take into account the totality of the circumstances, not employ a "divide-and-conquer analysis." Williams, 808 F.3d at 247. That being said, the Court must "address each of these factors before evaluating them together with the other circumstances of the stop" when considering factors listed by Officer Brantley that he says gave him reasonable

suspicion. United States v. Powell, 666 F.3d 180, 187-88 (4th Cir. 2011).

This Court has conducted a de novo review of the factors addressed by the magistrate judge in the report and recommendation and the government's objections to the report and recommendation.

Reasonable suspicion determinations are based on the totality of the circumstances in light of the officers' experience and specialized training. United States v. Arvizu, 534 U.S. 266, 273-74, 122 S. Ct. 744 (2002); see Branch, 537 F.3d at 337. Here, the officers gleaned information, from the driver Gilmore and the front seat passenger O'Brien, during the lawful traffic stop, as well as their own personal training and experience, that lead them to develop a reasonable suspicion based upon the totality of the circumstances in this particular case. The officers were able to articulate numerous factors, which were subsequently addressed by defense counsel during cross-examination at the suppression hearing, the magistrate judge in his report and recommendation, and the government in its objections. These factors include: (1) the vehicle being a rental vehicle and length of rental/trip; (2) the passengers' lack of ability to name friends they supposedly just visited; (3) inconsistent eye contact by the passengers; (4) nervousness as exhibited by the passengers; (5) different answers given by the passengers when asked where they had been; (6) the officer's focus on the passengers' travel in a "High-Intensity Drug

Trafficking Area;" (7) passengers all being from different states; (8) the backseat passenger being unidentified under a blanket and feigning sleep during the stop; and (9) the inaccurate information provided as to the identity of the defendant which returned no record.

Officer Brantley had developed reasonable suspicion at least by the time he talked with Officer Burke, and clearly articulated these reasons, prior to the dog sniff. Within 13 minutes of the initial stop of the vehicle, at approximately 10:29 a.m. when Officer Burke arrived on the scene, Officer Brantley was able to articulate several reasons why he was suspicious of the passengers in the vehicle and described the front seat passenger O'Brien as "iffy." Officer Brantley's testimony at the suppression hearing as to how these factors combined and created a reasonable suspicion of criminal activity in his mind corroborated the cruiser camera audio evidence as well as the information in his report which was prepared a few hours after the incident (ECF No. 30-2).

Reasonable suspicion may exist even if each fact standing alone is susceptible to an innocent explanation. United States v. McCoy, 513 F.3d 405, 413 (4th Cir. 2008). Courts must look at the cumulative information available to the officer, and not find a stop unjustified based merely on a piecemeal refutation of each individual fact and inference. Branch, 537 F.3d at 337 (internal quotations and citations omitted). A set of factors, each of which

was individually quite consistent with innocent travel, could still, taken together, produce reasonable suspicion of criminal activity. Id.

This Court finds that all of the facts mentioned above and available to Officer Brantley during the traffic stop, considered in their totality while mindful of how an experienced police officer might approach the same factual circumstances, eliminate a substantial portion of innocent travelers and made Officer Brantley's suspicion of active criminality reasonable.

For the reasons articulated above, this Court finds that the officers developed reasonable suspicion while completing tasks related to the traffic infractions and were able to identify reasonable suspicion of criminal activity to support the extension of the stop, permitting them to prolong the stop beyond the scope of the traffic violation in an attempt to confirm or dispel their suspicion. The officers' common sense judgments and inferences, and their own experience and training, lead them to reasonably suspect criminal activity under the totality of the circumstances and the cumulative information available to them.

C.   Defendant's Statements

The legal standards governing a motion to suppress are clear. The burden of proof is on the party who seeks to suppress the evidence. United States v. Dickerson, 655 F.2d 559, 561 (4th Cir. 1981). Once the defendant establishes a basis for his motion to

suppress, the burden shifts to the government to prove the admissibility of the challenged evidence by a preponderance of the evidence. <u>United States v. Matlock</u>, 415 U.S. 164, 177 n.14, 94 S. Ct. 988, (1974) ("[T]he controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence."). Where a defendant seeks to suppress a statement under <u>Miranda v. Arizona</u>, 384 U.S. 436, 86 S. Ct. 1602 (1966), the government bears the burden of establishing by a preponderance of the evidence that the statement was not the product of custodial interrogation conducted in the absence of <u>Miranda</u> warnings. <u>Colorado v. Connelly</u>, 479 U.S. 157, 168, 107 S. Ct. 515 (1986); <u>United States v. Matlock</u>, 415 U.S. 164, 177, 94 S. Ct. 988, 996 (1974).

In the course of deciding a motion to suppress, the district court may make findings of fact, as well as rulings of law. <u>United States v. Stevenson</u>, 396 F.3d 538, 541 (4th Cir. 2005) (citations omitted). "At a hearing on a motion to suppress, the credibility of the witnesses and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence, are all matters to be determined by the trial judge." <u>United States v. Gualtero</u>, 62 F. Supp. 3d 479, 482 (E.D. Va. 2014) (citing <u>United States v. McKneely</u>, 6 F.3d 1447, 1452–53 (10th Cir. 1993)).

This Court has conducted a _de novo_ review of the portion of the magistrate judge's report and recommendation concerning the defendant's motion to suppress statements and the government's objections thereto, and finds as follows.

This Court finds that at the point when the defendant raised her arm and indicated toward the Expedition, at approximately 11:37 a.m., the defendant was in custody. This is when the government contends the defendant made "voluntary statements." Three officers were standing between the police cruiser and the Expedition, the contents seized from the vehicle were placed on the ground and separated into groups, the trunk of the vehicle was opened, and Officer Brantley appeared to have taken several cell phones from the passengers and placed them on the hood of his police cruiser.

While the government makes much of the fact that the defendant and her travel companions were allowed to use their phones and smoke cigarettes, this Court finds that the traffic stop was over and they were not free to leave. "The operative question is whether, viewed objectively, 'a reasonable man . . . would have understood his situation' to be one of custody." United States v. Colonna, 511 F.3d 431, 435 (4th Cir. 2007) (quoting Berkemer v. McCarty, 468 U.S. 420, 422 (1984)). The average person in defendant's position would not feel free to leave, and believe themselves to be in custody. Officer Brantley conceded this point during the suppression hearing:

```
Q.   She was not free to leave, correct?
A.   Correct.
Q.   And you never read her her rights, at least before
she made those statements, correct?
A.   Yes.
```

ECF No. 38 at 80.

The government makes the argument, however, that the statements were completely voluntarily and asserts that the defendant voluntarily approached Officer Brantley and asked to talk with him separately prior to making the incriminating statements. This Court has closely reviewed the portion of the cruiser camera video which shows the point when the defendant raises her arm and indicates toward the front of the Expedition and Officer Brantley points to the area in front of the Expedition and the defendant follows Officer Brantley in that direction. This Court finds, at best, the video only evidences that the defendant engaged in a conversation with Officer Brantley near the front of the Expedition. The contents, manner, and details of the conversation are unclear, unknown, and heavily disputed.

The video does not show the defendant approach Officer Brantley in any way, and provides no evidence as to who initiated the conversation or what was discussed. This Court notes that, at this point in time, Officer Brantley was equipped with a body microphone on his uniform, which would have undoubtedly revealed the details of this conversation. However, it was not turned on.

```
Q.   Do you have a microphone on?
A.   I did have a microphone on my uniform, yes.
```

> Q.  Was it operational?
> A.  It was not at the time, no.
> Q.  Because the only time you can hear any audio is when
> you're inside of your cruiser, true?
> A.  Yes.
> Q.  It was not operational because?
> A.  It may not have been charged, it may not have been
> turned on at the time.  I don't know.

ECF No. 38 at 44.

Furthermore, as the magistrate judge correctly noted, Officer Brantley's police report on the matter seems to indicate that he initiated the conversation.  Officer Brantley's report, which was prepared by him only a few hours after the incident, specifically states:

> I went up to speak with Kenyon.  I asked Kenyon about the products in the bags.  Kenyon said to me "I'm going to be honest with you.  My real name is Stephanie and I'm wanted."  This is when Kenyon produced her real name and DOB.

ECF No. 30-2 at 3.

The report does not reflect that the defendant voluntarily approached Officer Brantley, or that Officer Brantley <u>Mirandized</u> the defendant before he "asked Kenyon" questions.  This Court find that when this conversation took place, the defendant had not been read her <u>Miranda</u> rights, and that it is unclear whether the defendant was ever advised of her rights to remain silent while in custody and being interrogated.  Under the rule established in <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the

26

use of procedural safeguards effective to secure the privilege against self-incrimination. Here, questioning initiated by law enforcement officers after the defendant has otherwise been deprived of her freedom of action in any significant way, amounts to custodial interrogation.

Officer Brantley returned to his cruiser after this conversation to check with dispatch regarding the true name and date of birth of the defendant at 11:45 a.m., and learned from the dispatcher that the information checked out on a Stephanie Kenyon, who was wanted for receiving stolen property.

Officer Brantley then returned to the front of the vehicle and again engaged in conversation with the defendant. This ultimately led the defendant to make several incriminating statements about her involvement with the possession and acquisition of the items discovered in the Nike bags.

This Court is tasked with the issue of balancing the evidence presented in order to determine whether the government has met its burden of establishing by a preponderance of the evidence that the statements by the defendant were not the product of custodial interrogation conducted in the absence of <u>Miranda</u> warnings. The evidence presented for this Court's consideration consists primarily of the testimony of the officers at the hearing on the motion to suppress, the conflicting police report of Officer Brantley which was authored a few hours after the incident, and the

inconclusive cruiser camera video evidence which is unaccompanied by any audio. After considering the evidence, this Court finds that the government has failed to meet its burden, and that the statements must be suppressed.

## VI. <u>Conclusion</u>

For the reasons stated, this Court AFFIRMS AND ADOPTS in part and DECLINES TO ADOPT in part the report and recommendation of the magistrate judge (ECF No. 37).

The government's objections to the report and recommendation (ECF No. 40) are SUSTAINED in part and OVERRULED in part.

The defendant's motion to suppress statements (ECF No. 16) is GRANTED. The defendant's motion to suppress search of vehicle for unreasonable extension of the traffic stop (ECF No. 17) is DENIED. The defendant's supplemental motion to suppress search of vehicle for illegal traffic stop and unreasonable extension of the traffic stop (ECF No. 25) is DENIED.

IT IS SO ORDERED.

The Clerk is DIRECTED to transmit copies of this memorandum opinion and order to counsel of record herein, to the defendant, to the United States Probation Office, and to the United States Marshals Service.

DATED:     April 6, 2018

/s/ Frederick P. Stamp, Jr.
FREDERICK P. STAMP, JR.
UNITED STATES DISTRICT JUDGE